Exhibit B

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MISSOURI

## EASTERN DIVISION

HAIN BLUEPRINT, INC.,

      Plaintiff,

      v.

BLUEPRINT COFFEE, LLC,

      Defendant.

No. 4:16-cv-1758

**EXPERT REBUTTAL REPORT SUBMITTED BY DR. JUSTIN R. ANDERSON IN RESPONSE TO THE EXPERT DECLARATION OF LISA SCHEER, Ph.D.**

# TABLE OF CONTENTS

Summary of My Opinions .................................................................................................... 1

Overview of the Scheer Survey ........................................................................................... 3

Detailed Opinions Regarding the Scheer Survey ................................................................ 7

   I.  The survey universe does not represent the correct population, and is over-inclusive of the population Dr. Scheer intended to represent. ................................................... 7

  II.  The survey failed to represent marketplace conditions.................................................... 10

 III.  The survey failed to include a control, and cannot demonstrate that the survey measures were caused by the disputed Blueprint Coffee marks........................................................ 13

 IV.  The survey methodology and questions were leading and vague. .................................. 15

  V.  Dr. Scheer lacks sufficient knowledge about certain aspects of the survey, and is unable to attest to the validity or reliability of the survey's execution........................................ 25

Conclusions......................................................................................................................... 27

My Qualifications ............................................................................................................... 27

Materials Reviewed and Compensation.............................................................................. 29

Exhibit 1:  Dr. Justin R. Anderson CV and Testimony Experience

1.      I have been retained by attorneys representing Blueprint Coffee, LLC, in the above litigation.  This rebuttal report sets forth my opinions regarding testimony provided by Dr. Lisa Scheer in the "Expert Declaration of Lisa Scheer, Ph.D." ("Scheer report"),[1] and the "Deposition of:  Dr. Lisa K. Scheer" ("Scheer deposition").[2]

2.      The opinions expressed in this report are based on materials I reviewed, research I conducted, and my experience.  I reserve the right to supplement this report in light of the ongoing discovery in this matter.


**Summary of My Opinions**

3.      Based on my review of Dr. Scheer's report and deposition testimony, my review of other materials identified in this report, and my experience, I believe that the survey conducted by Dr. Scheer (the "Scheer survey") is severely flawed, and does not provide a valid or reliable measure of the likelihood of confusion between Blueprint Coffee and Hain BluePrint marks.

4.      The Scheer survey suffers from significant flaws, including the following:

      i.      <u>The survey universe does not represent the correct population, and is over-inclusive of the population Dr. Scheer intended to represent.</u>  The Scheer survey did not sample the correct universe of prospective purchasers of Blueprint Coffee.  Instead, Dr. Scheer incorrectly intended to sample potential purchasers of Hain BluePrint.[3]  However, the Scheer survey actually sampled shoppers at stores that feature "natural, organic and healthy foods."[4]  This over-inclusive qualification failed to measure whether respondents are prospective purchasers of any products made or sold by either Blueprint Coffee or Hain BluePrint.  As a

---

[1] Dated October 22, 2017.

[2] Dated December 14, 2017.

[3] Scheer deposition (79: 17-18).

[4] Scheer report, p. 6.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

result, the Scheer survey fails to provide a measure of the likelihood of confusion among a consumer population that is relevant to this dispute.

ii.    <u>The survey failed to represent marketplace conditions.</u>  The survey showed respondents Blueprint Coffee's name and logo without the context consumers would encounter in a real marketplace situation.  The survey did not show respondents any packages of Blueprint Coffee products or any pictures of the Blueprint Coffee store.  The survey also failed to show respondents the Hain BluePrint logo as consumers would encounter it in a real marketplace situation.  Therefore, the Scheer survey failed to test for the likelihood that consumers might be confused when they encounter the Blueprint Coffee and/or Hain BluePrint marks in a real marketplace situation.

iii.    <u>The survey failed to include a control, and cannot demonstrate that the survey measures were caused by the disputed Blueprint Coffee marks.</u>  Without a control, the survey cannot determine how much of the reported likelihood of confusion was caused by the disputed Blueprint Coffee marks, and how much of the measure resulted from survey "noise," or false measures of confusion.

iv.    <u>The survey methodology and questions were leading and vague.</u>  The survey methodology failed to conform to either of the formats commonly used to measure likelihood of confusion, Eveready and Squirt.  Instead, the methodology created an unrealistic matching exercise that failed to measure the likelihood that consumers would be confused in a real marketplace situation.  Additionally, certain survey questions were leading, and failed to provide respondents with a "don't know" option.  Furthermore, certain survey questions were vague, including the description that "BLUEPRINT produces non-alcoholic beverages using plant-based ingredients."[5]  As a result of this vagueness, respondents may

---

[5] SCHEER000213.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

have thought that BLUEPRINT referred to Blueprint Coffee, and were not confused, though Dr. Scheer's calculations incorrectly treat them as such.

v.  <u>Dr. Scheer lacks sufficient knowledge about certain aspects of the survey, and is unable to attest to the validity or reliability of the survey's execution.</u>  Dr. Scheer is unable to identify the survey panel or panels that provided respondents for the survey.  She is unable to provide the email invitation used to recruit respondents for the survey, and she neither wrote nor reviewed that email invitation.  She does not know whether Qualtrics targeted respondents who met certain pre-defined criteria, nor what those criteria might have been.  She does not know whether validation was performed, nor how it might have been conducted.  She also does not know how many respondents were disqualified during the screening process.  Without information regarding these research issues, Dr. Scheer cannot confirm that Qualtrics conducted the survey in an unbiased and non-leading manner.

5.    As I have summarized above and will describe below in this rebuttal report, there are serious flaws in the design and execution of the Scheer survey.  As a result of these flaws, it is my opinion that the Scheer survey does not provide a valid or reliable measure of the likelihood of confusion between marks used by Blueprint Coffee and Hain BluePrint.

**Overview of the Scheer Survey**

6.    In her report, Dr. Scheer wrote that the survey "was conducted to determine whether consumers at Whole Foods Markets or other stores that feature natural, organic or healthy foods would believe that a product bearing the Blueprint Coffee Mark, is affiliated with the BLUEPRINT line of beverages."[6]

---

[6] Scheer report, paragraph 25.

7.    The Scheer report indicates that the survey was conducted online between October 13 and October 18, 2017,[7] among 400 respondents "recruited from members of an online panel, organized and administered by Qualtrics, a large internet survey company."[8]

8.    Upon beginning the survey, respondents were informed, "This research focuses on products sold in **grocery stores that feature natural, organic and healthy foods** such as Whole Foods, Natural Grocers, Trader Joes, Sprouts Farmers Market or similar local stores."

9.    Respondents were then asked screening questions to determine whether they qualify for the survey.  The first question asked, "Please select the choice below that best describes when you last shopped at a grocery store that features natural, organic and healthy foods."  Response options included, "Within 1 week," "Within 2 weeks," "Within 1 month," "Within 6 weeks," "Within 2 months," and "Longer than 2 months ago or Never."  Respondents who indicated that they last shopped at a grocery store that features natural, organic and healthy foods longer than 2 months ago or never were disqualified from the survey.

10.    Respondents were then asked a second screening question, "Does anyone in your household, including you, work for the following?  Please click all that apply."  Response options included, "A grocery store that features natural, organic and healthy foods," "A restaurant," "A marketing research firm or advertising agency," "A manufacturer, producer or wholesaler of consumer packaged foods," and "None of the above apply."  Respondents who indicated that they or someone else in their household works for a marketing research firm or advertising agency were disqualified from the survey.

11.    Respondents were asked a series of "Random" questions.[9]  The first of these asked respondents, "How well does the phrase 'I am a savvy shopper' describe you?"  Response options included, "Perfectly," "Very well," "Somewhat," "Slightly," and "Not at all."

---

[7] Scheer report, paragraph 34.  According to the dates listed in the data file, interviews were actually completed only on Friday, October 13; Monday, October 16; and Tuesday, October 17.

[8] Scheer report, paragraph 26.

[9] Scheer report, Exhibit B.

12.     The second of the "Random" questions asked, "At what type of store do you most frequently buy groceries?"  Response options included, "Convenience store (e.g., 7-11, quick shops)," "Grocery store (e.g., Kroger, Whole Foods)," "Mass merchandise store (e.g., Wal-Mart, Target)," "Other store," and "I don't buy groceries."

13.     The third of the "Random" questions asked, "For quality control, please click Very Well."  Response options included, "Perfectly," "Very well," "Somewhat," "Slightly," and "Not at all."

14.     Respondents were then provided the following information:

> The next questions ask about a specific brand of food products.

> There are thousands of grocery products sold in the U.S.  Many brands are only sold in some parts of the country.

> Your observations are valuable whether or not you are familiar with this brand. There are no wrong answers!

> Please take your time and read the information provided completely before answering the questions.

### BLUEPRINT

> You may or may not be familiar with BLUEPRINT beverages.

> BLUEPRINT produces non-alcoholic beverages using plant-based ingredients.

15.     Respondents were then asked, "Have you heard of BLUEPRINT beverages?"  Response options included, "Yes, I am familiar with BLUEPRINT beverages," "I am not sure – maybe," and "No, I am not familiar with BLUEPRINT beverages."

16.     Respondents were then shown the following information:

On your next grocery shopping trip, you notice a product



17.     Respondents were then asked, "Would you think that this coffee is part of the BLUEPRINT beverage family?"  Response options included, "Yes," "No," and "Maybe."

18.     Respondents who answered "Maybe" were then asked, "In your opinion, how likely is it that Blueprint Coffee is part of the BLUEPRINT beverage family?  Please move the slider below to indicate your opinion.  For example:

- 30% indicates that Blueprint Coffee is probably not part of the BLUEPRINT beverage family

- 90% indicates that Blueprint Coffee is almost certainly part of the BLUEPRINT beverage family

0    10    20    30    40    50    60    70    80    90    100"

19.     Respondents were then asked, "What is your gender?"  Response options included, "Male" and "Female."

20.     Respondents were then asked, "What is your age?"  Response options included, "Less than 18," "18-35," "36-59," and "60+."

21.     Respondents were then asked, "What device have you used to take this survey?"  Response options included, "Desktop or laptop computer," "iPad or tablet," "Smartphone or similar handheld device," and "Other."

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

22.     Dr. Scheer reported that, according to the survey, "61.25 % (245) of Respondents who completed the survey believed that Blueprint Coffee was associated with the BLUEPRINT family."[10]

23.     Dr. Scheer also reported that, according to the survey, "12.25 % (49) of Respondents were already familiar with the BLUEPRINT brand prior to the survey."[11]

**Detailed Opinions Regarding the Scheer Survey**

24.     It is my opinion that the measure of likelihood of confusion provided by the Scheer survey is seriously flawed.  These flaws bias the survey results, and diminish the validity and reliability of the Scheer survey and its findings.  I describe these flaws in detail below.

I.     **The survey universe does not represent the correct population, and is over-inclusive of the population Dr. Scheer intended to represent.**

25.     One of the most important elements of survey design is ensuring that the universe of survey respondents represents the consumer population at issue.  One legal scholar has written, "Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant."[12]

26.     To measure likelihood of confusion, "The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services."[13]  Based on that description, the proper survey universe for a likelihood of confusion survey in this matter would be potential buyers of Blueprint Coffee's whole bean coffee and/or potential patrons of the Blueprint Coffee store in St. Louis, MO.

---

[10] Scheer report, paragraph 36.a.

[11] Scheer report, paragraph 36.b.

[12] McCarthy, J. Thomas. § 32:159 "Relevant 'universe' surveyed - Defining the universe." *McCarthy on Trademarks and Unfair Competition*, 4th ed., West Group, 2014, p. 1.

[13] *See Amstar Corp. v. Domino's Pizza, Inc.* 615 F.2d 252, 264 (5th Cir. 1980), cited in William G. Barber (2012), "The Universe," in Shari Seidman Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys:  Law Science and Design*, American Bar Association: Section of Intellectual Property Law, p. 29.  This refers to the survey universe for a survey measuring "forward" confusion.

27.      At one time during her research design, Dr. Scheer instructed one of her contacts at Qualtrics that respondents, "Must be buyers of whole bean coffee."[14]  It is not clear why Dr. Scheer changed her mind, but the Scheer survey did not qualify respondents as "buyers of whole bean coffee."

28.      Instead, Dr. Scheer has testified that she intended for the survey universe to represent purchasers of Hain BluePrint.  As she stated, "So in my opinion, the most relevant public are potential consumers of Hain Blueprint."[15]

29.      However, the Scheer survey universe failed to represent even the population of potential Hain BluePrint consumers that Dr. Scheer incorrectly intended to sample.  Instead, the Scheer survey qualified respondents as shopping "at a grocery store that features natural, organic and healthy foods" within the last 2 months.[16]

30.      This qualification criterion was over-inclusive[17] because it failed to measure whether respondents are potential purchasers of whole bean coffee, or whether they are potential patrons of a store or restaurant that sells coffee, like the Blueprint Coffee store.  As a result, the Scheer survey universe fails to represent the population of potential purchasers of the product and service categories offered by Blueprint Coffee.

31.      The qualification criterion also failed to measure whether respondents are potential purchasers of cold pressed juice.  As a result, the Scheer survey universe fails to represent the population that Dr. Scheer intended to represent, which is potential purchasers of products offered by Hain BluePrint.

---

[14] SCHEER000141.

[15] Scheer deposition (79: 17-18).

[16] SCHEER000211.

[17] "A universe may be improperly over-inclusive by encompassing such a large group of persons that it includes those whose perceptions are not relevant, thus skewing the results by introducing irrelevant data." McCarthy, J. Thomas. § 32:161 "Relevant 'universe' surveyed – Examples of inappropriate universe." *McCarthy on Trademarks and Unfair Competition*, 4th ed., West Group, 2014, p. 1.

Expert Rebuttal Report of Dr. Justin R. Anderson
                                                     No. 4:16-cv-1758

32.     It is my understanding that coffee from Blueprint Coffee and cold pressed juice from Hain BluePrint may only be sold in proximity in a few Whole Foods Market stores.[18] However, the Scheer survey failed to qualify respondents as potential purchasers at Whole Foods Market stores.  The survey asked respondents when they "last shopped at a grocery store that features natural, organic and healthy foods."[19]  A previous statement in the survey provided examples of "**grocery stores that feature natural, organic and healthy foods**," which included "Whole Foods, Natural Grocers, Trader Joes, Sprouts Farmers Market or similar local stores."[20]

33.     Respondents who indicated that they "last shopped at a grocery store that features natural, organic and healthy foods" within the last two months might have been thinking about Natural Grocers, Trader Joe's, Sprouts Farmers Market, similar local stores, or some other store.  There is no indication that any respondents shopped at a Whole Foods Market store.

34.     Even if respondents had shopped at a Whole Foods Market store in the last two months, the survey failed to qualify respondents as purchasers of whole bean coffee or cold pressed juice.  A consumer might shop at a Whole Foods Market, but not buy whole bean coffee or cold pressed juice.  Such consumers would not be potential purchasers of Blueprint Coffee whole bean coffee, and would not be relevant to this matter.  They also would not be potential purchasers of Hain BluePrint cold pressed juice, and would not be relevant to this matter, nor to the population Dr. Scheer intended to survey.  Merely shopping "at a grocery store that features natural, organic and healthy foods" is over-inclusive of the population relevant to this matter.

---

[18] Based on information provided by counsel.

[19] SCHEER000211.

[20] SCHEER000211.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

35.    The Scheer survey also did not qualify respondents as purchasing groceries online.  Dr. Scheer indicated that she believes online purchases are relevant in this dispute.[21]  However, she acknowledged the survey "… didn't ask any questions in this survey to try to find the people who are likely to buy either of those products online…."[22]  If it was Dr. Scheer's intent to survey respondents who represent online purchasers, the survey failed to do so.

36.    Because the Scheer survey failed to qualify respondents as prospective purchasers of Blueprint Coffee products or services, the survey universe does not represent the population of potential Blueprint Coffee customers.  As such, the survey universe is inappropriate for measuring likelihood of confusion for this matter.

## II.        The survey failed to represent marketplace conditions.

37.    A survey measuring likelihood of confusion should present respondents with stimuli that represent how consumers would encounter the disputed product or mark in a real marketplace situation.  As one legal scholar has written, "…the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."[23]

38.    The Scheer survey failed to represent a realistic marketplace situation.  In a real marketplace situation, consumers might encounter a package of Blueprint Coffee whole bean coffee that includes information besides the name and logo, and that additional information might make the coffee's origin clear to consumers, or at least, reduce or eliminate the potential for confusion with Hain BluePrint.

---

[21] Scheer deposition:  "But when a product is available online, the specific physical locations at which it was available aren't as critical." (78:22 to 79:1), "They are sold online.  Clearly, there is potential for people to encounter both brands in the marketplace, whether they encounter one in a store and the other online." (152: 14-17).

[22] Scheer deposition (154: 10-14).

[23] McCarthy, J. Thomas. § 32:163 "Survey methodology - Approximating market conditions." *McCarthy on Trademarks and Unfair Competition*, 4th ed., West Group, 2014, p. 1.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

39.     Alternatively, consumers might encounter the Blueprint Coffee store.  Information presented in the store, such as products displayed, signage, menus, or other cues, might make the store's origin clear to consumers, or at least, reduce or eliminate the potential for confusion with Hain BluePrint.

40.     The Scheer survey did not show packages of Blueprint Coffee products, or pictures of packages of Blueprint Coffee products.  The Scheer survey also did not present respondents with pictures of the Blueprint Coffee store.

41.     Instead, the survey showed respondents the Blueprint Coffee name and logo[24] without the realistic context of a product package or store imagery.  By failing to show respondents any other information displayed on packages of Blueprint Coffee or displayed in the Blueprint Coffee store, the survey deprived respondents of a realistic opportunity to determine the origin of the Blueprint Coffee mark, and failed to represent realistic marketplace conditions.

42.     The Scheer survey also showed respondents the name BLUEPRINT with a description that Dr. Scheer intended to represent Hain BluePrint.  The survey showed this mark out of context, and did not show any products or pictures of products of Hain BluePrint cold pressed juice.

43.     Dr. Scheer testified that she could not decide which Hain BluePrint product to show. She stated, "Secondly, not including a package was the notion, again, of what would be the appropriate package to provide; which one should be the one that would be chosen.  There are many different products in the line."[25]

---

[24] SCHEER000214.

[25] Scheer deposition (129: 19-23).

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

44.    Surveys measuring likelihood of confusion often display products or pictures of products to respondents.[26]  When a line of products is at issue, the survey might show respondents the best-selling product, might show multiple products that represent the variety in the line, or might show products selected per other criteria.

45.    Dr. Scheer's inability to decide which product or products to display does not justify her failure to test a product or picture of a product that would represent consumers' exposure to Blueprint Coffee whole bean coffee and/or Hain BluePrint cold pressed juice in a real marketplace situation.

46.    As previously mentioned, Dr. Scheer indicated that she believes online purchases are relevant in this dispute.  However, the Scheer survey did not represent an online purchase context.  The survey did not display images of website pages on which consumers can purchase any products made or sold by Hain BluePrint or Blueprint Coffee, or any other stimulus as consumers would encounter it in a real online marketplace situation.

---

[26] *See* Jerre B. Swann (2012), "Likelihood of Confusion," in Shari Seidman Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys:  Law Science and Design*, American Bar Association: Section of Intellectual Property Law.  "In a typical Eveready format, a respondent is first shown an exemplar, photograph, or advertisement of defendant's trademarked (or 'dressed') product…." (p. 56).  In a typical Squirt format, the survey shows "… the plaintiff's and defendant's product…." (p. 65).

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

### III.     The survey failed to include a control, and cannot demonstrate that the survey measures were caused by the disputed Blueprint Coffee marks.

47.     Survey responses may be affected by a number of factors.  One such factor may be the disputed elements, which in this matter are the Blueprint Coffee name and logo.  However, there are other reasons why respondents might have provided answers indicating confusion that are not caused by the disputed Blueprint Coffee name or logo.  Such factors may include pre-existing attitudes, inattentiveness, demand effects,[27] response order bias,[28] acquiescence bias,[29] or other factors.

48.     The use of a control can allow a survey to measure "general background noise."[30] Noise may manifest itself as a false positive measurement.  In other words, noise might cause a respondent to indicate a likelihood of confusion when none exists.  A control can measure the effect of such influences, and allow a survey to isolate the effect associated with the disputed elements.

49.     Likelihood of confusion surveys commonly use a control stimulus, or external control. A control stimulus is typically similar to the test stimulus, but has been modified to remove or alter the disputed elements.  Typically, "…the expert should select a stimulus for the control group that shares as many characteristics with the experimental [test] stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[31]

---

[27] A demand effect is bias caused by respondents trying to provide socially acceptable answers or answers they believe would be helpful to the survey sponsor or researcher.  *See* Joseph F. Hair et al, *Marketing Research: In a Digital Information Environment*, McGraw-Hill Irwin, 2009, p. 284.

[28] Response order bias can be caused by the order in which responses are displayed.  For example, some respondents might select the first or last response from a list simply because it was listed first or last.  *See* Pamela L. Alreck, and Robert B. Settle, *The Survey Research Handbook*, Irwin, 1995, p. 103.

[29] Acquiescence bias can be caused by the possible tendency of survey respondents to agree with survey questions presented in certain formats, such as "yes" and "no" response options.  *See*, Baumgartner, Hans, and Jan-Benedict E.M. Steenkamp. "Response Styles in Marketing Research: A Cross-National Investigation." *Journal of Marketing Research*, vol. 38, no. 2, May 2001, pp. 143–156.

[30] McCarthy, J. Thomas. § 32:187 "The need for a survey control." *McCarthy on Trademarks and Unfair Competition*, 4th ed., West Group, 2014, p. 1.

[31] Diamond, Shari Seidman. "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence*, Third Edition, National Academy Press, 2011, p. 399.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

50.     A control stimulus is typically shown to a separate group of respondents who are not exposed to the test stimulus.  Respondents are typically randomly assigned to be exposed to either the test stimulus or the control stimulus.  By subtracting the noise measured by the control stimulus from the test measure, a survey researcher can calculate a "net" measure caused only by the disputed elements.

51.     The Scheer survey did not include a control.  All respondents were shown the Blueprint Coffee name and logo, and were asked questions about Blueprint Coffee.  No respondents were exposed to any control stimulus instead of the Blueprint Coffee name and logo.  As a result, there is no way to determine how much, if any, of the survey's measure of likelihood of confusion was caused by the disputed Blueprint Coffee name and logo, or by survey noise unrelated to the Blueprint Coffee name and logo.

52.     Dr. Scheer's explanation for not including a control was, "It wasn't clear to me what a control would be in this case."[32]  When asked about a possible control, Dr. Scheer indicated she could have done that, but that "It didn't seem relevant."[33]

53.     Dr. Scheer also seemed to acknowledge that her survey does not account for survey noise.  When asked how she knows the survey measures wouldn't have been the same "no matter what word you used, whether it's Blueprint, Greenprint, Yellowprint or whatever," Dr. Scheer replied, "There is no way to be certain."[34]

54.     Dr. Scheer's lack of clarity about how to create a control, or her decision that a control wasn't relevant, does not justify her failure to include a control to measure survey noise, or false positive measures of likelihood of confusion.

---

[32] Scheer deposition (143: 5-6).

[33] Scheer deposition (143: 16).

[34] Scheer deposition (144: 7-11).

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

IV.    **The survey methodology and questions were leading and vague.**

55.    Two survey methods, *Eveready*[35] and *Squirt*,[36] are "the predominant formats"[37] for measuring likelihood of confusion, and have been accepted by courts as valid and reliable methods for measuring likelihood of confusion.

56.    The Scheer survey did not conform to either of these commonly accepted survey formats.  Instead, the Scheer survey employed a different format, which was leading in its methodology and asked questions that were leading and vague.

57.    One way in which the Scheer survey was leading was in its methodology.  The survey exposed respondents to the term BLUEPRINT, with the description "BLUEPRINT produces non-alcoholic beverages using plant-based ingredients."[38]  Later, the survey exposed respondents to the Blueprint Coffee name and logo, and asked "Would you think that this coffee is part of the BLUEPRINT beverage family?"[39]  Respondents were allowed to select "Yes," "No," or "Maybe."

58.    The Scheer survey methodology was leading because it created an unrealistic matching exercise.  The survey isolated the Blueprint Coffee mark and asked respondents to indicate whether they believed that single mark to be related to the word BLUEPRINT they had previously been shown.

---

[35] *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 385-88 (7th Cir. 1976).

[36] *Squritco v. Seven-Up Co.*, 628 F.2d 1086, 1089 n.4, 1091 (8th Cir. 1980).

[37] Jerre B. Swann (2012), "Likelihood of Confusion," in Shari Seidman Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys:  Law Science and Design*, American Bar Association: Section of Intellectual Property Law, p. 53.

[38] SCHEER000213.

[39] SCHEER000214.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

59.     Isolating the Blueprint Coffee mark in this manner "generates extreme demand effects."[40]  That is why surveys that adopt the Squirt format typically "show the plaintiff's and defendant's product in the context of a number of products about which they would be questioned.  This removes the spotlight from the products of the plaintiff and defendant, helps avoid making obvious what the survey is about, and makes the survey more realistic and less leading."[41]

60.     The Scheer survey did not show the Blueprint Coffee mark as part of an array or line-up of products that would be sold in proximity to Blueprint Coffee products in a real marketplace situation.

61.     By isolating the Blueprint Coffee mark, the survey encouraged respondents to make a connection between the word Blueprint in Blueprint Coffee and the word BLUEPRINT.  In a real marketplace situation with product packaging and other cues to examine, consumers might not make such a connection.

---

[40] Jerre B. Swann (2012), "Likelihood of Confusion," in Shari Seidman Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys:  Law Science and Design*, American Bar Association: Section of Intellectual Property Law, p.65.

[41] *Tokidoki, LLC v. Fortune Dynamic, Inc.*, 2009 U.S. Dist. LEXIS 65665, *21-22 (C.D. Cal 2009), quoted in Jerre B. Swann (2012), "Likelihood of Confusion," in Shari Seidman Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys:  Law Science and Design*, American Bar Association: Section of Intellectual Property Law, p. 65.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

62.    Figure 1 below shows pictures of a bottle of cold pressed juice made by Hain BluePrint.

**Figure 1:  Pictures of a Bottle of Cold Pressed Juice Made by Hain BluePrint[42]**

 

---

[42] Pictures shown in Figures 1 and 2 were provided by counsel.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

63.    Figure 2 below shows pictures of a package of whole bean coffee made by Blueprint Coffee.

**Figure 2:  Pictures of a Package of Whole Bean Coffee Made by Blueprint Coffee**





- 18 -

64.    As shown in Figures 1 and 2, bottles of cold pressed juice made by Hain BluePrint and packages of whole bean coffee made by Blueprint Coffee include information besides just product names and logos.  This additional information includes the following:

i.    Bottles of cold pressed juice made by Hain BluePrint display the BluePrint name with a capital letter "B" and a capital letter "P," and the rest of the letters in lower case.  Packages of whole bean coffee made by Blueprint Coffee display the Blueprint name in all capital letters.

ii.    Bottles of cold pressed juice made by Hain BluePrint display the BluePrint name with the letters all displayed on the same line.  Packages of whole bean coffee made by Blueprint Coffee display the Blueprint name with the letter "U" offset on a raised line.

iii.    Bottles of cold pressed juice made by Hain BluePrint display the Hain BluePrint logo, which appears to be shaped like a leaf consisting of six petals inside a filled circle.  Packages of whole bean coffee made by Blueprint Coffee display the Blueprint Coffee logo, which is shaped like an empty hexagon with lines connecting opposite endpoints of the hexagon, and triangle drawn inside the hexagon using dashed lines.

iv.    Bottles of cold pressed juice made by Hain BluePrint indicate that the product is distributed by "The Hain Celestial Group, Inc." and display the company's address in Lake Success, NY.  Packages of whole bean coffee made by Blueprint Coffee indicate that the product is from Blueprint Coffee, with an address listed in Saint Louis, MO.  The packages also include the company's website address and Twitter account.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

65.     Consumers who encounter bottles of cold pressed juice made by Hain BluePrint and packages of whole bean coffee made by Blueprint Coffee in a real marketplace situation would be able to compare these and other cues to determine whether they believe there is a connection between the products or the companies that make them.  By failing to display products or pictures of products to respondents, the Scheer survey prohibited respondents from using information besides name and logo to determine whether they believe whole bean coffee from Blueprint Coffee is made by Hain BluePrint; affiliated, connected, or associated with Hain BluePrint; or sponsored or approved by Hain BluePrint.

66.     The Scheer survey was also leading because it indicated to respondents that there is only one Blueprint brand.  As described previously, the Scheer survey instructed respondents, "The next questions ask about a specific brand of food products."[43]  That instruction suggests to respondents that the subsequent questions ask about only one brand.

67.     The two questions that immediately follow that instruction ask whether respondents have ever heard of BLUEPRINT beverages and whether they think that Blueprint Coffee is part of the "BLUEPRINT beverage family."  Since the survey instruction suggests that these questions ask about one brand, respondents may assume that Blueprint Coffee is part of the "BLUEPRINT beverage family" because of the instruction they were given that these questions ask about one brand, and not because of any perceived similarity between the names.  Thus, responses that Dr. Scheer reported as indicating confusion may actually reflect the leading instruction given to respondents in the survey, and not potential consumer confusion.

---

[43] SCHEER000213.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

68.     The Scheer survey is also leading because it did not offer respondents a "don't know" option for certain questions.  Surveys can "reduce guessing by providing 'don't know' or 'no opinion' options."[44]  For the question measuring likelihood of confusion, the Scheer survey allowed respondents to select "Maybe," but respondents might not interpret "Maybe" the same as "Don't know."  Respondents who did not know the answer or had no opinion might have been encouraged to guess.

69.     Guessing could have inflated "Yes" responses due to demand effects,[45] acquiescence bias,[46] or other factors.  By failing to provide a "don't know" option, the Scheer survey was leading by encouraging respondents to guess "Yes."

70.     The potential for such bias is exacerbated because the Scheer survey did not instruct respondents not to guess.  As one scholar explains, "Thus, at some point prior to being asked closed-ended questions, the respondents need to be explicitly instructed not to guess. Otherwise, they will be inclined to guess, and this usually will be in the directions they suspect are desired by the interviewer or researcher."[47]

71.     The Scheer survey did not provide an instruction not to guess.  On the contrary, Dr. Scheer departed from common practice and allowed or encouraged respondents to guess.  As she testified, "Should a respondent be trying to guess in some way, wanted to just make it clear that you are not more or less valued in terms of your response."[48]

---

[44] Diamond, Shari Seidman. "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence*, Third Edition, National Academy Press, 2011, p. 390.

[45] A demand effect is bias caused by respondents trying to provide socially acceptable answers or answers they believe would be helpful to the survey sponsor or researcher.  *See* Joseph F. Hair et al, *Marketing Research: In a Digital Information Environment*, McGraw-Hill Irwin, 2009, p. 284.

[46] Acquiescence bias can be caused by the possible tendency of survey respondents to agree with survey questions presented in certain formats, such as "yes" and "no" response options.  *See*, Baumgartner, Hans, and Jan-Benedict E.M. Steenkamp. "Response Styles in Marketing Research: A Cross-National Investigation." *Journal of Marketing Research*, vol. 38, no. 2, May 2001, pp. 143–156.

[47] Jacob Jacoby, "Are Closed-Ended Questions Leading Questions," in Shari Seidman Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys:  Law Science and Design*, American Bar Association: Section of Intellectual Property Law, p. 273.

[48] Scheer deposition (127: 16-18).

72.     The screening question that qualified respondents for the survey was also leading.  The survey first informed respondents, "This research focuses on products sold in **grocery stores that feature natural, organic and healthy foods** such as Whole Foods, Natural Grocers, Trader Joes, Sprouts Farmers Market or similar local stores."  Respondents were then asked, "Please select the choice below that best describes when you last shopped at a grocery store that features natural, organic and healthy foods."  Response options included, "Within 1 week," "Within 2 weeks," "Within 1 month," "Within 6 weeks," "Within 2 months," and "Longer than 2 months ago or Never."[49]

73.     This qualification question was leading.  The Scheer survey never asked respondents if they had ever shopped at a grocery store that features natural, organic and healthy foods.  It only asked "when" respondents "last shopped" at such a store.  This may suggest to respondents that they needed to indicate that they shopped at such a store recently if they wish to be rewarded for participating in the survey.  Although respondents were given the option to select "Never," the fact that the leading instruction told them the survey focused on those types of stores may have discouraged respondents from selecting that response.

74.     In addition to being leading, the qualification question was also vague.  The question failed to define "natural, organic and healthy foods."  According to the product website, Snackwell's Devil's Food Cookie Cakes are fat-free, and do not contain high fructose corn syrup or partially hydrogenated oils.[50]  Some consumers might consider these cookies to be healthy because they lack certain ingredients deemed to be unhealthy.  If a respondent answered the qualifying question thinking about Snackwell's cookies or other products that lack certain unhealthy ingredients, then the qualifying question was invalid.

---

[49] SCHEER000211.

[50] Snackwell's website, htp://www.snackwells.com/products/devils-food/, accessed December 14, 2017.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

75.     The qualifying question was also vague in its use of the word, "features."  It is not clear how much of a store's product assortment must be "natural, organic and healthy foods" for the store to "feature" those foods.  A respondent might believe that a Kroger grocery store that advertises a price discount for organic bananas has featured natural, organic and healthy food.  If such a respondent answered the qualifying question thinking about that kind of situation, then the qualifying question was invalid.

76.     The qualifying question was also vague in its use of the word "shopped."  As quoted previously, the appropriate universe for a likelihood of confusion survey "should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services."[51]  The survey universe should include "purchasers," but the qualification question asked when respondents last "shopped" at a relevant store.

77.     It is not clear that respondents would interpret shopping the same as purchasing.  Shopping may include activities such as window-shopping, browsing a retail website, talking to a store clerk, accompanying a friend on their shopping trip, or some other activity that does not involve a purchase.  A respondent might believe that because they browsed the magazine aisle in a Whole Foods Market while waiting for a friend to make a purchase, they have "shopped" at the store.  If such a respondent answered the qualifying question thinking about that kind of non-purchase shopping activity, then the qualifying question was invalid.

78.     As described, the qualifying question was vague as to the meaning of "natural, organic and healthy foods," the meaning of "feature," and the meaning of "shopped."  Because the question was vague, the survey might have included respondents who should not have qualified for the survey.

---

[51] *See Amstar Corp. v. Domino's Pizza, Inc.* 615 F.2d 252, 264 (5th Cir. 1980), cited in William G. Barber (2012), "The Universe," in Shari Seidman Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys:  Law Science and Design*, American Bar Association: Section of Intellectual Property Law, p. 29.  This refers to the survey universe for a survey measuring "forward" confusion.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

79.     The Scheer survey was also vague and overly broad in its description of the name BLUEPRINT.  As previously described, the survey presented respondents with the term BLUEPRINT and the description "BLUEPRINT produces non-alcoholic beverages using plant-based ingredients."[52]  That description is vague.  Dr. Scheer may have intended this to refer to Hain BluePrint, but it is not clear whether respondents interpreted the description as referring to Hain BluePrint, Blueprint Coffee, both, or neither.

80.     Dr. Scheer acknowledged that the description could include Blueprint Coffee.  As she testified, "But plant based obviously includes multiple sub-categories within it.  It includes fruit, it includes vegetables.  It includes things people don't realize are fruit, like coffee."[53]  She also testified:[54]

> "A      What I said was that there would be several subcategories within non-alcoholic beverages using plant based ingredients, such as fruit based, vegetable based and so forth; other plant based ingredients.
>
> "Q      Yeah.  And coffee.
>
> "A      And coffee."

81.     Dr. Scheer's testimony indicates that the description of BLUEPRINT provided in the survey was vague, and might include Hain BluePrint, Blueprint Coffee, both, or neither.  Therefore, respondents who indicated that they think Blueprint Coffee is part of the "BLUEPRINT beverage family" were not necessarily confused.  Dr. Scheer's calculation of likelihood of confusion incorrectly treats them as such.

---

[52] SCHEER000213.

[53] Scheer deposition (137: 15-19).

[54] Scheer deposition (138: 19-25).

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

## V.    Dr. Scheer lacks sufficient knowledge about certain aspects of the survey, and is unable to attest to the validity or reliability of the survey's execution.

82.    The Scheer report omits certain information about how the survey was conducted, and Dr. Scheer appears to have no knowledge about these issues, which she delegated to Qualtrics.

83.    Dr. Scheer has indicated that she hired Qualtrics, and that Qualtrics sourced respondents from an online survey panel or panels.[55]  However, Dr. Scheer is unable to identify the survey panel or panels that Qualtrics used.  As she testified, "That is never disclosed.  At least it's never been disclosed in any of my interactions with them."[56]

84.    Dr. Scheer is unable to provide the email invitation that potential survey respondents received.  As she testified, "Exactly the verbiage of what they are told in that recruitment email, I do not know, and I do not – I have never known that.  That's typically been considered proprietary information about the relationship between Qualtrics and the panel providers."[57]

85.    Survey panels typically maintain a database containing certain information about panel members.  Researchers sometimes send survey invitations only to panel members who are listed in the database as meeting certain criteria.  This practice is sometimes referred to as targeting.  Dr. Scheer does not know whether Qualtrics targeted respondents who met certain criteria, nor what the targeting criteria may have been.  As she testified, "There is – exactly how Qualtrics chooses which panel and which members of that panel to contact is always between them."[58]

---

[55] Scheer deposition (89: 20-23).

[56] Scheer deposition (90: 5-6).

[57] Scheer deposition (91: 23 to 92: 4).

[58] Scheer deposition (92: 16-18).

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

86.     Validation is "a common survey procedure"[59] designed to ensure interviews were conducted properly and that respondents were qualified for the survey.  Dr. Scheer does not know whether Qualtrics performed any validation, nor what the validation procedure may have been.  As she testified, "But in terms of did I go and verify, that information is typically not disclosed."[60]

87.     Dr. Scheer has testified[61] that she does not know how many respondents were disqualified from her survey during the screening process.

88.     Dr. Scheer has been unable to provide any information regarding what panel or panels were used to provide respondents, what information was disclosed to potential respondents in the email invitation, what criteria were used for targeting potential respondents, how validation was performed, or how many respondents were disqualified from the survey.  She claims that Qualtrics would not provide this information.  In my experience, that is highly unusual.

89.     In my experience working with research vendors like Qualtrics, those companies typically provide their clients with details regarding the execution of research studies.  In my conversations with Qualtrics employees, Qualtrics is willing to provide this information.  It is my understanding that testifying experts providing opinions based on survey research typically provide such information, either in their expert reports or when asked to provide the information.

90.     Because Dr. Scheer is unable to obtain information regarding these research issues from Qualtrics, she cannot verify that Qualtrics conducted the survey in a manner that is unbiased and non-leading.

---

[59] McCarthy, J. Thomas. § 32:170 "Tests of properly conducted survey – Effect of deficiencies in survey methodology." *McCarthy on Trademarks and Unfair Competition*, 4th ed., West Group, 2014, p. 2.

[60] Scheer deposition (96: 19-20).

[61] Scheer deposition (118: 18-22 and 126: 22 to 127: 2).

## Conclusions

91.    As I have described in this rebuttal report, the Scheer survey suffers from significant flaws, including the following:

     i.    The survey universe does not represent the correct population, and is over-inclusive of the population Dr. Scheer intended to represent.

     ii.    The survey failed to represent marketplace conditions.

     iii.    The survey failed to include a control, and cannot demonstrate that the survey measures were caused by the disputed Blueprint Coffee marks.

     iv.    The survey methodology and questions were leading and vague.

     v.    Dr. Scheer lacks sufficient knowledge about certain aspects of the survey, and is unable to attest to the validity or reliability of the survey's execution.

92.    These are serious flaws in the design and execution of the Scheer survey.  As a result of these flaws, it is my opinion that the Scheer survey does not provide a valid or reliable measure of the likelihood of confusion between marks used by Blueprint Coffee and Hain BluePrint.

## My Qualifications

93.    I am a Vice President with MMR Strategy Group ("MMR"), a marketing research and consulting firm founded in 1974.  In this position, I have personally designed and conducted surveys about a variety of topics, including likelihood of confusion.

94.    I have earned a Doctorate of Philosophy (PhD) in Business Administration with a concentration in Marketing from the University of Southern California.  My doctoral studies included training in survey research methods, statistics, and marketing, among other topics.  I also earned a Master of Business Administration (MBA) with a concentration in Marketing from the University of Illinois at Urbana-Champaign, and a Bachelor of Science in Atmospheric Science from the University of Wisconsin – Madison.

95.     I have taught MBA and undergraduate courses in marketing research, consumer behavior, and marketing strategy as a Marketing professor at the University of North Carolina Wilmington and at California State Polytechnic University, Pomona, and as a Marketing instructor at the University of Southern California.  The courses I taught in marketing research emphasized survey research methods.

96.     I have presented my research at conferences of the American Marketing Association and delivered other invited presentations at universities.  In September, 2016, I presented a webinar, titled "Litigation Surveys for Non-Traditional Marks," to a meeting of the U.S. Subcommittee of the Non-Traditional Marks Committee of the International Trademark Association (INTA).  In October, 2015, I was a panelist at a Continuing Legal Education seminar, titled "Using Surveys in Intellectual Property Matters," sponsored by the Bar Association of San Francisco.

97.     I serve on the editorial board of the *Journal of Brand Strategy*, and serve as a reviewer for the *Journal of Brand Strategy*, the *Journal of Brand Management*, and *Arts and the Market* (formerly *Arts Marketing*).  I have previously served as a reviewer for *Marketing Science*.

98.     I am a member of the American Marketing Association, the Insights Association, the Brand Activation Association, the Association of National Advertisers, and the International Trademark Association.  I have also served as a member of the Non-Traditional Marks Committee of the International Trademark Association.

99.     I previously worked as a Research Director at Lieberman Research Worldwide, and as a Senior Research Analyst at BBDO Chicago.  In both of those positions, I designed and conducted research surveys for a variety of clients in diverse industries.  I have also served as a meteorological officer in the United States Air Force.

100.     I have been retained in several other litigation matters.  Exhibit 1 provides my curriculum vitae and testimony experience.

Expert Rebuttal Report of Dr. Justin R. Anderson
No. 4:16-cv-1758

**Materials Reviewed and Compensation**

101.    For this report, I have reviewed the following materials:

> i.    Documents filed in this matter, including the Complaint, dated November 11, 2016; and Plaintiff Hain BluePrint, Inc.'s Responses and Objections to Defendant Blueprint Coffee, LLC's Second Interrogatories, dated July 17, 2017.

> ii.    Expert Declaration of Lisa Scheer, Ph.D., dated October 22, 2017.

> iii.    Materials provided in connection with the Scheer report, including SCHEER000001 to SCHEER000257.

> iv.    The Scheer survey, located at https://congenuity.co1.qualtrics.com/jfe/form/SV_0PrLMR4gCNFcwn3.

> v.    A transcript and video recordings of the Deposition of:  Dr. Lisa K. Scheer, dated December 14, 2017; Exhibits A through W of that deposition; and the errata sheet for that deposition, dated January 26, 2018.

> vi.    Pictures of product packages, including Blueprint Coffee whole bean coffee and Hain BluePrint beverages, provided by counsel.

> vii.    Websites of the parties involved in this disputed, including blueprint.com and blueprintcoffee.com.

102.    In addition, I consulted published literature and cases relevant to the issues and theories in this matter, the most relevant of which are cited in this report.  I also rely on my knowledge in fields such as surveys, consumer behavior, and marketing.

103.    MMR billed $20,000 for this rebuttal report.  After the production of this report, my time in this matter is billed at $550 per hour, except for testimony at deposition or trial, which is billed at $5,000 per day.  These fees do not depend on the outcome of this matter.

Executed in Encino, California, on February 15, 2018.


_____

Dr. Justin R. Anderson

**Exhibit 1:**
**Dr. Justin R. Anderson CV and Testimony Experience**

**MMR STRATEGY GROUP**
*Creating growth through customer insight.*™

16501 Ventura Boulevard, Suite 601, Encino, CA 91436 • Phone (818) 464-2400 • www.mmrstrategy.com

# DR. JUSTIN R. ANDERSON, MBA, PHD

**Summary of Qualifications**

- Expertise in marketing and survey research.
- Experience in intellectual property matters.
- Doctorate, University of Southern California; MBA, University of Illinois; Bachelor of Science, University of Wisconsin.

---

**MMR Strategy Group**, Encino, CA                                  2014 – Present
**VICE PRESIDENT**

MMR provides surveys, analysis, and consulting to measure the attitudes and behaviors of customers and prospective customers.  MMR has three primary practice areas:

1. Marketing Research and Consulting:  MMR provides marketing research and consulting to help clients improve products, and develop marketing and sales strategies.

2. Litigation Surveys:  MMR provides surveys and testimony for intellectual property matters.  MMR has been retained by firms including Jones Day, Proskauer Rose, and others.  MMR has also been retained by government agencies, including the Department of Justice and the Federal Trade Commission.

3. Claim Substantiation:  MMR provides research and consulting to help clients evaluate claims made in packaging, advertising, and other marketplace communications.

- As Vice President, I design surveys, manage research projects, and provide consulting for clients.  I have conducted more than one hundred surveys during my career.

- I regularly conduct surveys and have experience with rebuttals to surveys for intellectual property litigation and claim substantiation matters.

- I have published peer-reviewed articles in academic journals and been invited to speak to conferences of the American Marketing Association and other groups.  I frequently write on topics relating to marketing and survey research.

---

**Education**

- Doctor of Philosophy (**PhD**) in Business Administration (concentration in Marketing), **University of Southern California**, 2007.  Awarded Doctoral Fellowship.

- Master of Business Administration (**MBA**) (concentration in Marketing), **University of Illinois**, 2001.  Graduated with Academic Excellence.

- Bachelor of Science (**BS**) in Atmospheric Science, **University of Wisconsin**, 1995.

**Prior Professional Experience**

**Lieberman Research Worldwide**, Los Angeles, CA                                    2012 – 2014
**RESEARCH DIRECTOR**

**MMR Strategy Group**, Encino, CA                                                            2011 – 2012
**RESEARCH DIRECTOR**

**California State Polytechnic University, Pomona**, Pomona, CA        2010 – 2011
**VISITING PROFESSOR OF MARKETING**

**University of North Carolina Wilmington**, Wilmington, NC            2007 – 2010
**ASSISTANT PROFESSOR OF MARKETING**

**University of Southern California**, Los Angeles, CA                        2005 – 2006
**INSTRUCTOR OF MARKETING**

**University of Southern California**, Los Angeles, CA                        2002 – 2004
**RESEARCH FELLOW**

**BBDO Chicago**, Chicago, IL                                                                  2001 – 2002
**SENIOR RESEARCH ANALYST**

**United States Air Force**, Various Locations                                        1996 – 1999
**METEOROLOGICAL OFFICER**

**Honors and Awards**

- Named an Impact Professor, University of North Carolina Wilmington, 2008, 2009, 2010

- Winner, American Marketing Association Best Lecture Slide Competition, Brands and Branding category, 2008

- Winner, American Marketing Association Best Lecture Slide Competition, Society and Marketing category, 2008

- Excellence in Teaching Award, Marketing Department, Marshall School of Business, University of Southern California, 2005 – 2006

- Doctoral Fellowship, Marshall School of Business, University of Southern California, 2002 – 2007

- MBA Graduate with Academic Excellence (top 15% of class), 2001

- Inducted into Beta Gamma Sigma business honor society, 2001

**MMR**

**Appointments and Affiliations**

- Member, Insights Association, 2017 – Present

- Editorial Board, *Journal of Brand Strategy,* 2014 – Present

- Member, International Trademark Association (INTA), 2014 – Present

- Member, Brand Activation Association (BAA), 2014 – Present

- Member, Association of National Advertisers (ANA), 2014 – Present

- Reviewer, *Journal of Brand Management,* 2011 – Present

- Reviewer, *Arts and the Market* (formerly *Arts Marketing),* 2011 – Present

- Member, American Marketing Association (AMA), 2002 – Present

- Member, Non-Traditional Marks Committee, International Trademark Association, 2016 – 2017

- Member, Marketing Research Association (MRA), 2014 – 2016

- Member, Faculty Teaching Committee, College of Business, California State Polytechnic University, Pomona, 2010 – 2011

- Faculty Advisor, Pi Sigma Epsilon professional sales fraternity, California State Polytechnic University, Pomona, 2010 – 2011

- Chair, Scholarship Committee, Cameron School of Business, University of North Carolina Wilmington, 2009 – 2010

- Faculty Advisor, Student Veterans Organization, University of North Carolina Wilmington, 2008 – 2010

- Member, Military Task Force, University of North Carolina Wilmington, 2008 – 2010

- Member, Scholarship Committee, Cameron School of Business, University of North Carolina Wilmington, 2008 – 2009

- Reviewer, Atlantic Marketing Association Conference, Consumer Behavior/Marketing Research track, 2008

- Reviewer, Society of Consumer Psychology Doctoral Dissertation Proposal Competition, 2008

- Member, Faculty Growth and Development Committee, Cameron School of Business, University of North Carolina Wilmington, 2007 – 2009

- Reviewer, *Marketing Science,* 2006 – 2007

MMR

## Publications and Public Speaking Engagements

- "Litigation Surveys for Non-Traditional Marks," presentation to the U.S. Subcommittee of the INTA Non-Traditional Marks Committee, September 2016.

- "Using Surveys in Intellectual Property Matters," Continuing Legal Education (CLE) seminar presented to the Bar Association of San Francisco, October 2015.

- Anderson, Justin (2011), "Measuring the Financial Value of Brand Equity: The Perpetuity Perspective," *Journal of Business Administration Online*, 10 (1), 1-11.

- "Brand Equity: The Perpetuity Perspective," Presented to AMA Winter Educators' Conference, 2007.

- "Entertainment Expectations: How Affective Forecasting and Regret Cause Consumers to Prefer Familiar Mediocrity Over Superior Novelty," Presented to Houston Doctoral Symposium, 2006.

- "Entertainment Consumption: How Entertainment Goods Give the People What They Want," Presented to AMA Winter Educators' Conference, 2006.

## Blog Posts Written for www.MMRStrategy.com

### Marketing and Marketing Research

- "Can You Measure a Longitudinal Variable in a Cross-Sectional Survey?" (July, 2015)

- "Three Questions to Ask Before Introducing a Brand Extension" (January, 2015)

- "Is Your Country Brand Name Expansionist or Isolationist?" (December, 2014)

- "Are In-Person Surveys Better Than Online Surveys?" (November, 2014)

### Litigation Surveys

- "When Do You Need a False Advertising Survey" (September, 2015)

- "Three Essential Elements of a Genericness Survey" (November, 2014)

MMR

**<u>Undergraduate and MBA Marketing Courses Taught</u>**

- Business Research Methods

- Buyer Behavior

- Consumer Behavior

- Marketing Intelligence and Communication

- Marketing Research

- Marketing Strategy

- Marketing the Movies

- Principles of Marketing

**<u>Selected Topics of Study in MBA and PhD Programs</u>**

- <u>Research Methods and Research Design</u>:  Doctoral research seminars focused on buyer decision making, consumer psychology, individual choice modeling, marketing management, marketing strategy modeling, and research design and measurement

- <u>Statistics</u>:  Doctoral-level courses in probability and statistics focused on comparing groups, hierarchical linear modeling, linear regression analysis, multivariate analysis techniques, and structural equation modeling

- <u>Marketing</u>:  Consumer Behavior, Customer Marketing, Global Marketing, Marketing Management, Marketing Research, Marketing Strategy, Pricing, Promotion Management

- <u>Management</u>:  Business Strategy, Corporate Strategy, International Business, Strategic Theory

- <u>Communications, Psychology and Sociology</u>:  Communications Theory, Organization Theory and Design, Organizational Behavior

- <u>Economics and Finance</u>:  Capital Market Environment. Financial Accounting, Game Theory, Macroeconomics, Managerial Accounting, Managing Cash Flows, Microeconomic Theory, Microeconomics

MMR

**Dr. Justin R. Anderson Litigation Expert Witness Experience**
**February 2018**

Cases in which Dr. Justin R. Anderson has testified as an expert, including written expert reports or testimony at deposition or trial, in the past four years.

**DRL Enterprises, Inc. v. North Atlantic Operating Company, Inc., North Atlantic Trading Company, Inc., and National Tobacco Company, L.P.**
United States District Court, Northern District of Illinois
Retained by Plaintiff

**Titletown Brewing Co., LLC v. Green Bay Packers, Inc.**
United States Patent and Trademark Office, Trademark Trial and Appeal Board
Retained by Petitioner

**Federal Trade Commission v. Stratford Career Institute, Inc.**
United States District Court, Northern District of Ohio
Retained by Plaintiff

**Rimowa Distribution, Inc. v. Travelers Club Luggage, Inc.**
United States District Court, District of Massachusetts
Retained by Defendant

**Metal Jeans, Inc. v. Affliction Holdings, LLC and The Buckle, Inc.**
United States District Court, Central District of California
Retained by Plaintiff

**Gibson Brands, Inc. v. John Hornby Skewes & Co., Ltd.**
United States District Court, Central District of California
Retained by Defendant

MMR